[Cite as *Matyas v. Matyas*, 2025-Ohio-5100.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| KELLY JO MATYAS, | **CASE NO. 2025-T-0007** |
| Plaintiff-Appellant, | |
| - vs - | Civil Appeal from the Court of Common Pleas, Domestic Relations Division |
| WILLIAM FRANKLIN MATYAS, | |
| Defendant-Appellee. | Trial Court No. 2022 DR 00228 |

## OPINION AND JUDGMENT ENTRY

Decided: November 10, 2025
Judgment: Affirmed in part and reversed in part; remanded

*Jennifer J. Ciccone*, The Ciccone Law Firm, LLC, 3685 Stutz Drive, Suite 100, Canfield, OH 44406 (For Plaintiff-Appellant).

*Lynn Sfara Bruno*, 412 Boardman-Canfield Road, Youngstown, OH 44512; and *Rhys B. Cartwright-Jones*, 42 North Phelps Street, Youngstown, OH 44503 (For Defendant-Appellee).

MATT LYNCH, J.

{¶1} Appellant, Kelly Jo Matyas, appeals the judgment of the Trumbull County Court of Common Pleas, Domestic Relations Division, whereby the court issued a decree of divorce between her and appellee, William Franklin Matyas. The parties were married on July 6, 2020, and separated in August 2022. One child was born as issue of the marriage and was three years old at the time of the final divorce hearing. The issues on appeal concern the termination of marriage date, disposition of the marital residence and other assets, and child support. We affirm in part and reverse in part.

{¶2} Kelly initially filed for divorce on October 26, 2022. William counterclaimed on November 18, 2022. The proceedings were stayed for a considerable amount of time due to Kelly's August 31, 2022 bankruptcy filing. Kelly voluntarily dismissed her divorce complaint with prejudice on May 10, 2024. The matter proceeded on William's counterclaim for divorce after he obtained relief from the stay in Kelly's bankruptcy case. The final divorce hearing was held on October 28, 2024. Both parties appeared with counsel, as did the court-appointed guardian ad litem for the minor child.

{¶3} The trial court issued its judgment entry and decree of divorce on February 19, 2025, granting the parties a divorce on the grounds of incompatibility and having lived separate and apart without cohabitation and without interruption for a period greater than one year. The court rejected Kelly's request for a de facto termination of marriage date, ordered the sale of the marital residence, distributed marital assets and debts, and ordered William to pay child support.

{¶4} Kelly filed a timely notice of appeal, raising four assignments of error for our review.

{¶5} Kelly's first assignment of error concerns the termination of marriage date:

[1.] The Trial Court erred and abused its discretion by failing to find a de facto termination date of the marriage as August 2022, resulting in an inequitable division of marital property.

{¶6} At trial, Kelly requested that the trial court adopt a de facto termination date of August 2022, coinciding with the parties' separation. The court denied this request, instead finding the date of trial, October 28, 2024, was equitable in this matter. The court found that William "has been unable to disentangle himself from this marriage" due to delays resulting from Kelly's bankruptcy proceedings and its effect on William's credit.

Case No. 2025-T-0007

{¶7}    Kelly argues that the trial court's findings are not supported by credible evidence and resulted in an inequitable division of marital property.  She contends the uncontroverted evidence establishes that the parties physically and financially separated in August 2022.  William responds that the trial court acted well within its broad discretion by insisting on documented proof of financial and residential separation before adopting an earlier termination date.

{¶8}    "In any order for the division or disbursement of property . . ., the court shall make written findings of fact that support the determination that the marital property has been equitably divided and shall specify the dates it used in determining the meaning of 'during the marriage.'"  R.C. 3105.171(G).  The term "during the marriage" may be defined as "the period of time from the date of the marriage through the date of the final hearing," R.C. 3105.171(A)(2)(a), or, if the court finds the date of the final hearing would be inequitable, "the court may select dates that it considers equitable in determining marital property," R.C. 3105.171(A)(2)(b).

{¶9}    "'Equity may occasionally require valuation as of the date of the *de facto* termination of the marriage.  The circumstances of a particular case may make a date prior to trial more equitable for the recognition, determination and valuation of relative equities in marital assets.'"  *Marini v. Marini*, 2006-Ohio-3775, ¶ 11 (11th Dist.), quoting *Berish v. Berish*, 69 Ohio St.2d 318, 320 (1982).  "'Generally, trial courts use a de facto termination of marriage date when the parties separate, make no attempt at reconciliation, continually maintain separate residences, separate business activities and/or separate bank accounts.  . . .  Courts should be reluctant to use a de facto termination of marriage date solely because one spouse vacates the marital home.  . . .  Rather, a trial court may use a de facto termination of marriage date when the evidence clearly and bilaterally

shows that it is appropriate based upon the totality of the circumstances.'" *Id.* at ¶ 13, quoting *Harris v. Harris*, 2003-Ohio-5350, ¶ 11 (11th Dist.). "The 'decision is discretionary and will not be reversed on appeal absent an abuse of discretion.'" *Id.*, quoting *Stafinsky v. Stafinsky*, 116 Ohio App.3d 781, 785 (11th Dist. 1996). An abuse of discretion occurs when the court's judgment is "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶10} The record demonstrates that the trial court's decision not to use a de facto termination of marriage date was neither unreasonable, arbitrary, nor unconscionable. The court's finding that Kelly's bankruptcy prolonged the joint financial entanglement is supported by William's testimony regarding the impact of Kelly's bankruptcy, which halted the divorce proceedings and introduced ongoing credit risk. Kelly did not produce any evidence that the parties closed joint accounts or signed legal instruments demonstrating a financial separation in August 2022. We therefore conclude the court's decision not to use a de facto termination of marriage date was within its sound discretion.

{¶11} The first assignment of error is without merit.

{¶12} Kelly's second assignment of error concerns the trial court's disposition of the marital residence:

> [2.] The Trial Court erred and abused its discretion and committed reversible error by asserting jurisdiction over the Oregon Avenue residence—acquired prior to the marriage—and awarding a separate property interest to [William] without making the required findings as to the existence or value of a marital interest in the property, in violation of R.C. 3105.171 and established precedent.

{¶13} The parties purchased a home at 731 Oregon Avenue, McDonald, Ohio in April 2020, approximately two to three months prior to their July 6, 2020 wedding. The

Case No. 2025-T-0007

trial court denied Kelly's request to be awarded the residence and instead ordered that it be sold subject to William's separate property interest.

{¶14} Kelly argues that the trial court improperly exercised jurisdiction over premarital property without proper classification and failed to determine or value any marital interest as required by law. William responds that the trial court properly classified the property based on the only competent evidence presented and ordered sale of the property rather than engage in impermissible speculation as to value.

{¶15} The distribution of assets in a divorce proceeding is governed by R.C. 3105.171. Prior to distribution, the trial court is required to determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B). This is a factual inquiry, which is reviewed using the "some competent, credible evidence" standard. *See Ostmann v. Ostmann*, 2006-Ohio-3617, ¶ 9 (9th Dist.). "This standard of review 'is highly deferential and even "some" evidence is sufficient to sustain the judgment and prevent a reversal.'" *Id*., quoting *Barkley v. Barkley*, 119 Ohio App.3d 155, 159 (4th Dist. 1997). The trial court then has considerable discretion in determining what property division is equitable upon the facts and circumstances of each case. *Cherry v. Cherry*, 66 Ohio St.2d 348, 355 (1981).

{¶16} Separate property includes, but is not limited to, any "interest in real or personal property that was acquired by one spouse prior to the date of the marriage." R.C. 3105.171(A)(6)(a)(ii). "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). "The party seeking to have the commingled property deemed separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to his or her separate

Case No. 2025-T-0007

property." (Citation omitted.) *Ostmann* at ¶ 11. Once traced, a spouse's separate property shall be disbursed to that spouse. R.C. 3105.171(D).

{¶17} It is undisputed that William took a $19,942.00 premarital loan from his 401(k) and contributed $11,209.77 towards the down payment on the mortgage, using the remainder to purchase Kelly's engagement ring. The trial court found that William established a separate property interest of $8,824.15 in the residence:

> This is comprised of the original loan amount paid on the real estate of $11,209.77 less the principal which was repaid during the marriage from marital income of $2,385.62. While the court recognizes that the loan was used as a down payment on the real estate and to purchase a ring for the Plaintiff, the Defendant is unable to trace the principal repayment to a specific part of the loan. As the burden falls on the Defendant to trace his separate property interest, he is only able to show a separate property interest to the extent the loan has not been repaid from marital funds. Furthermore, just as the Defendant is allocated his separate property interest, he must also be allocated the 401(k) loan as his separate debt.

{¶18} Aside from William's separate property interest, the court found the residence was marital property. The court found there was insufficient evidence to determine the property's current value:

> There was no testimony presented by the Plaintiff of her intentions, ability, or any attempt by her to refinance the mortgage or otherwise have the mortgage taken out of the Defendant's name. Moreover, the court has not been provided with evidence of the current value of the property. The Defendant had an appraisal prepared on the property one (1) year in advance of the trial, and he provided testimony of the appraiser to support said appraisal. Conversely, the Plaintiff used the unusual trial tactic of not putting on any case in chief. This left the Court with no valuation presented by the Plaintiff as to the value of the home or any testimony to determine if she had any separate property interest in the residence. With the current unprecedented market fluctuation and without further testimony or evidence of *current* value, the Court is unable to properly determine an accurate value of the Oregon Avenue Property.

The trial court ordered the residence to be listed with a licensed realtor at its fair market value and sold upon reasonable offer. Upon sale, the court ordered that William shall

Case No. 2025-T-0007

receive the first $8,824.15 of the net sales proceeds, with Kelly and William each receiving a one-half share of the remaining net sales proceeds.

{¶19} Contrary to Kelly's assertion on appeal, competent and credible evidence supports the trial court's classification and distribution of the residence. Both parties testified that William used $11,209.77 from a premarital 401(k) loan towards the down payment and closing costs approximately two to three months prior to the marriage. William testified that he made payments toward the 401(k) loan by paycheck deduction during the marriage. He introduced financial exhibits in support of his testimony, which established that a total of $2,385.62 was paid towards the principal of the entire loan amount. Kelly offered no competing classification evidence. She claimed that she paid the mortgage after the parties separated in August 2022 but presented no corroborating evidence.

{¶20} Moreover, neither party presented evidence as to the property's current market value, the principal balance remaining on the mortgage, or the equity subject to division. William offered a 2023 appraisal and the county auditor's assessments from 2021 and 2022. Although both parties testified that the 2023 appraisal at $179,000.00 was a fair valuation, it was over one year old at the time of trial. Accordingly, the court's decision to order the house sold at fair market value and the net proceeds equally divided was an equitable decision within the court's sound discretion.

{¶21} The second assignment of error is without merit.

{¶22} Kelly's third assignment of error concerns the court's vehicle and tax rulings:

[3.] The Trial Court erred and abused its discretion and committed reversible error by failing to assign a value to the 2020 Chevrolet Silverado and by allocating $4,000 in debt to [Kelly] for a previously resold GMC Acadia without evidentiary support, in violation of R.C. 3105.171 and established precedent, and ordering [Kelly] to amend her taxes contrary to her

Case No. 2025-T-0007

bankruptcy guidelines and not considering the hardship, ramifications, or that the parties never previously filed jointly and that [Kelly] was previously granted the right to claim [the minor child] pursuant to an Administrative Child Support Order.

{¶23} As discussed above, the distribution of assets in a divorce proceeding is governed by R.C. 3105.171. The trial court has considerable discretion in making property distributions in domestic cases. *See Cherry*, 66 Ohio St.2d at 355. However, the classification of property as marital or separate is a factual inquiry that must be supported by competent, credible evidence. *Ostmann*, 2006-Ohio-3617, at ¶ 9 (9th Dist.).

{¶24} Regarding the vehicles, Kelly argues that the trial court abused its discretion by (1) assessing a $4,000.00 offset in marital debt against her for a sold GMC Acadia, despite testimony that she had no involvement in its sale and no evidence of the debt, and (2) by failing to value William's 2020 Chevrolet Silverado, despite acknowledging the vehicle's significance and sustaining an objection to valuation evidence.

{¶25} The trial court ordered that William shall retain his Silverado, free and clear of any claim of Kelly; Kelly's interest in the Silverado "shall be offset against the First Commonwealth Bank debt in the sum of $8,000.00 which shall be the sole responsibility" of William; and William shall pay and hold Kelly harmless from the "debt owed to First Commonwealth Bank in the sum of approximately $8,000.00 owed for the repossession of the Chevrolet [sic] Acadia motor vehicle." The court based this conclusion on its finding that the $8,000.00 loss is marital debt for which William remains liable to First Commonwealth Bank. However, we find no support for this finding in the record.

{¶26} William testified that he owns a 2020 Chevrolet Silverado, Kelly owns a 2018 Chevrolet Equinox, and he also purchased for Kelly a new GMC Acadia during the marriage. According to William, when the parties separated in 2022, neither party could

Case No. 2025-T-0007

afford to make the payments on two vehicles, so he had to sell the Acadia back to the dealership at an $8,000.00 loss. To cover the loss, William testified that his parents paid $8,000.00 to the dealership, and he later reimbursed his parents with $8,000.00 he received in proceeds from a motorcycle accident. He introduced a copy of a check from his parents' bank account made payable to the dealership and a statement from his parents' bank account that shows an $8,000.00 cash deposit. Neither of these exhibits include William's name or indicate what car the transaction was for, nor do they establish that William owes $8,000.00 to First Commonwealth Bank. Another exhibit was admitted, listing transaction history from a First Commonwealth Bank account with multiple entries labeled "repossession fee payment." William testified that this exhibit related to his vehicle, not to the Acadia he sold at an $8,000.00 loss. Kelly testified that she made the down payment and monthly payments on the GMC Acadia and that she was not aware the vehicle was being sold or that William was required to take an $8,000.00 loss.

{¶27} Because the trial court's classification of the $8,000.00 in negative equity as marital debt is not supported by competent, credible evidence, the $4,000.00 offset against Kelly's interest in the Silverado was an abuse of discretion. Nevertheless, we do not find reversible error as it pertains to the trial court's disposition of the vehicles in this case.

{¶28} Neither party offered any admissible evidence as to the value of William's Silverado or Kelly's Equinox at the time of trial, and therefore the trial court had no means by which to create an equal division in terms of the monetary value of the vehicles. We are not prevented from reviewing the fairness of the trial court's disposition of the vehicles, and we conclude that awarding each spouse the working vehicle titled in his or her name, free and clear of the other spouse's interest, was an equitable solution consistent with the

facts revealed at trial. Accordingly, the $4,000.00 offset against Kelly's interest in the Silverado amounts to harmless error.

{¶29} Kelly's final argument under this assignment of error is that the trial court abused its discretion by ordering her to amend her tax returns contrary to her bankruptcy status and prior child support orders.

{¶30} At trial, both parties testified that they had never filed joint tax returns and that Kelly had previously claimed the minor child on her individual tax returns. William requested permission to claim the minor child on his 2024 tax return. It was revealed at trial that the parties were previously ordered to file a joint tax return for 2024 and that Kelly had filed individually in 2022 and 2023, despite a restraining order, pursuant to the instructions of her bankruptcy attorney. The trial court ordered the following:

> The Plaintiff shall cooperate to file amended tax returns for tax year 2022 and 2023 jointly with the Defendant within sixty (60) days of the date of this order, subject to contempt for her failure to timely complete the same. The Plaintiff having previously received refunds from her individual filing, any further refunds received shall be deposited into the IOLTA account of [Attorney Bruno], who shall accumulate the same. The total refunds received by the parties for the 2022 and 2023 tax filings shall be equally divided between the parties, with each receiving one-half of the refunds. This may include the Plaintiff paying a portion of the refund(s) which she already received to the Defendant for him to receive his one-half share. In addition, the parties shall file their 2024 taxes in the manner which maximizes their combined tax refunds and/or minimizes their combined tax liability. They shall equally split any refunds or tax obligations for 2024. The court shall retain continuing jurisdiction to issue such orders as may be necessary to effectuate the equal division of tax liability and refunds between the parties for the tax years 2022, 2023 and 2024 under this provision.

{¶31} We discern no abuse of discretion with this decision, and Kelly's argument that the parties have never filed jointly and she was previously granted the authority to claim the minor child for tax purposes is unsupported with precedent and does not lead us to a different conclusion.

Case No. 2025-T-0007

{¶32} The third assignment of error is without merit.

{¶33} Kelly's final assignment of error concerns the court's child support award:

[4.] The Trial court erred and abused its discretion, in violation of due process and R.C. 3119.05, when it took additional evidence regarding the parties' incomes for purposes of calculating child support after the trial concluded, without allowing cross-examination, without gathering necessary financial data such as [Kelly's] health insurance premiums, cost of daycare, and number of dependents, and without placing the evidence into the trial record, resulting in an unsupported and substantially understated child support award.

{¶34} We agree with Kelly's position that the trial court violated R.C. 3119.05 and deprived her of due process by relying on post-trial, off-record income information without cross-examination or inquiry into key statutory factors such as insurance, daycare, and dependents.

{¶35} "Although the standard of review for a trial court's child support determination is abuse of discretion, challenges to factual determinations upon which the child support order is based are reviewed using the 'some competent credible evidence' standard. Since a determination of gross income for support purposes is a factual finding, we must review the trial court's decision to see whether it is supported by some competent credible evidence." (Internal citations omitted.) *Jajola v. Jajola*, 2004-Ohio-370, ¶ 8 (8th Dist.).

{¶36} William was ordered to pay child and cash medical support in the amount of $380.07 per month commencing February 19, 2025. In support of this order, the trial court found, "[b]ased upon the evidence presented," that Kelly's income for child-support purposes was $84,252.80 and William's was $48,505.60. The court does not state what evidence was presented, as there was none presented.

Case No. 2025-T-0007

{¶37} "When a trial court determines a parent's income for purposes of calculating child support, it must verify the income 'with suitable documents, including, but not limited to, paystubs, employer statements, receipts and expense vouchers related to self-generated income, tax returns, and all supporting documentation and schedules for the tax returns.'" *Id*. at ¶ 14, quoting R.C. 3119.05(A). "Indeed, income for child support purposes is not always equivalent to the parent's taxable income." *Id*.

{¶38} R.C. 3119.01(C)(10) defines "income" for purposes of calculating child support as "either of the following: (a) For a parent who is employed to full capacity, the gross income of the parent; (b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent." "Gross income" is defined in R.C. 3119.01(C)(13) as "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes income from salaries, wages, overtime pay, and bonuses to the extent described in division (D) of section 3119.05 of the Revised Code; commissions; royalties; tips; rents; dividends; severance pay; pensions; interest; trust income; annuities; social security benefits, including retirement, disability, and survivor benefits that are not means-tested; workers' compensation benefits; unemployment insurance benefits; . . . and all other sources of income. 'Gross income' includes . . . self-generated income; and potential cash flow from any source."

{¶39} The transcript belies William's argument that the income figures were stipulated by both attorneys and that Kelly's attorney did not raise an objection or request further evidence. Kelly's attorney attempted to discuss Kelly's daycare expenses, William's mandatory overtime, and the parties' other children; however, the court simply admitted all the exhibits and concluded the hearing. The figures used for the parties'

annual income resulted from a quick calculation at the bench by William's attorney using what she believed to be the parties' hourly wages. The conversation happened hastily, and no time was offered for a proper objection:

> THE COURT: There's one element that I have to do to finish this case, which no one has presented me any evidence of through testimony. I know [sic] what she makes a year because I have to do a child support calculation because I cannot rely on the temporary order.
>
> [WILLIAM'S ATTORNEY]: His pay stub is marked as an exhibit, Your Honor. I'll tell you which exhibit it is.
>
> [KELLY'S ATTORNEY]: Your Honor, just so you know, for the record, we admitted into it [sic], there has been no temporary order in this case for child support.
>
> THE COURT: Well, they – well, the – the Administrative Order.
>
> [KELLY'S ATTORNEY]: Yes.
>
> THE COURT: But because you're having a divorce, I have to do a child support calculation –
>
> [KELLY'S ATTORNEY]: Correct.
>
> THE COURT: – which would be the same as if it was a temporary order, so I misspoke on that. So what's he make? She makes about 80,000?
>
> [KELLY'S ATTORNEY]: Correct.
>
> [WILLIAM'S ATTORNEY]: It was Exhibit E. She actually makes $84,093. I just calculated it, Your Honor, based on her testimony of 40 – I think she said 40.91 an hour. And is that – I could give you the exact figure because I just calculated. $84,052.80.
>
> THE COURT: Eighty-four thousand what?
>
> [WILLIAM'S ATTORNEY]: Fifty-two dollars and eighty cents. And he –
>
> THE COURT: You good with that?
>
> [KELLY'S ATTORNEY]: Well, yeah. And then there's daycare as well.
>
> [WILLIAM'S ATTORNEY]: And there's no written proof of the daycare, Your Honor.

Case No. 2025-T-0007

THE COURT: And he makes what?

[WILLIAM'S ATTORNEY]: Twenty-three sixty-two. I believe it's on Exhibit – it's our Exhibit –

THE COURT: What'd you calculate that out to?

[WILLIAM'S ATTORNEY]: Give me one second, Your Honor, and I will – if I have it, it's one of our exhibits. I just had it here. E. Exhibit E. I have it. It's Exhibit E. I think it's 23.32 times 40 times 52. It's 48,505.60.

THE COURT: 48,505 –

[WILLIAM'S ATTORNEY]: 505.60.

THE COURT: All right.

[WILLIAM'S ATTORNEY]: And he pays support for . . . his older son, through the state of –

THE COURT: I got that.

[KELLY'S ATTORNEY]: There's no evidence of that in the record either.

[WILLIAM'S ATTORNEY]: It's actually on –

THE COURT: There's testimony about [his older son].

[WILLIAM'S ATTORNEY]: And it – it's on the exhibit –

THE COURT: In fact, you were the one that brought it up that it said he paid his support to Pennsylvania.

[WILLIAM'S ATTORNEY]: And, Your Honor –

[KELLY'S ATTORNEY]: But they didn't – but they didn't say him.

[WILLIAM'S ATTORNEY]: It's on Exhibit E, his support deduction. It's on there.

[KELLY'S ATTORNEY]: He also – he also has mandatory overtime. He's closer to like 65,000, and it was not offered into evidence.

THE COURT: Goodbye.

[WILLIAM'S ATTORNEY]: Thank you, Your Honor.

[KELLY'S ATTORNEY]: Can I move to admit my exhibits?

THE COURT: Yes.

[KELLY'S ATTORNEY]: I move to admit all my exhibits.

THE COURT: They're admitted.

William's exhibits also had been admitted without objection. Among those admitted was Exhibit E. However, this exhibit was offered only to establish the cost of healthcare and provides no information regarding the income or other expenses of the parties. Due to the lack of competent, credible evidence in the record, we find the trial court erred in its determination of the parties' income for child support purposes.

{¶40} Kelly's fourth assignment of error is sustained.

{¶41} For the foregoing reasons, the decree of divorce issued by the Trumbull County Court of Common Pleas, Domestic Relations Division, is affirmed in part and reversed in part. The matter is remanded to the trial court for further proceedings related to the child support award.

ROBERT J. PATTON, P.J.,

JOHN J. EKLUND, J.,

concur.

Case No. 2025-T-0007

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, it is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas, Domestic Relations Division, is affirmed in part and reversed in part. This case is remanded for further proceedings consistent with the opinion.

Costs to be taxed against the parties equally.

 

JUDGE MATT LYNCH

PRESIDING JUDGE ROBERT J. PATTON,
concurs

JUDGE JOHN J. EKLUND,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-T-0007